IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CARL HUMPHREYS,
            Plaintiff,

v.                                                    No:  3:05cv449/RV/MD

JO ANNE B. BARNHART,
Commissioner of Social Security,
            Defendant.
_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Carl Humphreys' application for disability insurance benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

In March 1999, plaintiff filed applications for disability insurance benefits and SSI.  The applications were denied initially and on reconsideration and plaintiff

requested a hearing before an Administrative Law Judge (ALJ).  A hearing was held on February 1, 2001 at which plaintiff was represented by counsel and testified.  The ALJ rendered an unfavorable decision June 15, 2001 and plaintiff sought relief from the Appeals Council.  The Appeals Council remanded (tr. 207-209) directing the ALJ to 1) evaluate plaintiff's impairments through December 31, 1997 for Title II purposes, that being the date he last satisfied the insured status requirements for disability; 2) provide the plaintiff and his representative the opportunity to request the completion of interrogatories from consulting physician Peter Szymoniak, M.D.; 3) give further consideration to the opinion of plaintiff's treating physician, and, as appropriate, to request additional information or clarification from that physician if the ALJ felt it necessary; 4) further evaluate the plaintiff's mental impairment; 5) give further consideration to the plaintiff's maximum residual functional capacity; and, 6) if warranted by the expanded record, obtain supplemental evidence from a vocational expert.

On February 23, 1996, a new ALJ, Judge Ryan, opened a hearing, but took no testimony, instead ordering additional consultations.  Two more hearings were held, on November 14, 2003 and on July 30, 2004, at which plaintiff was represented by counsel and testified.  A vocational expert testified at both hearings.  On March 24, 2005, Judge Ryan rendered an unfavorable decision (tr. 20-34) and the Appeals Council declined review (tr. 10-12), making Judge Ryan's decision of March 24, 2005 the decision of the Commissioner, and therefore subject to review in this court. *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff last met the disability insured status for eligibility for benefits under Title II on December 31, 1997; that he had a combination of musculoskeletal and psychiatric impairments that imposed more than minimal limitations on his ability to perform some basic

work related activity; that his impairments, individually and in combination, did not meet or equal the presumptively disabling medical criteria listed in Part A to Appendix 1, subpart P, Regulations No. 4); that his allegations of chronic, incapacitating pain, anxiety, depression and other reported physical and mental symptoms could not all be considered credible given the vast disparity shown to exist between the objectively demonstrable medical evidence and the alleged intensity and persistence of the symptoms, the lack of treatment for mental problems and the lack of documented reliable manifestations of a disabling loss of functional capacity; that plaintiff possessed the residual functional capacity to perform a wide range of the exertional and non-exertional requirements of unskilled light work on a regular basis; that plaintiff was a younger individual with a high school diploma and some limited college but with no transferrable skills; that expert testimony supported a conclusion that plaintiff could perform such light jobs as courier, small parts assembler and hand packager, among others, all of which exist in significant numbers in the national economy and the state of Florida; and that the plaintiff was not under a disability as defined in the Act.

## STANDARD OF REVIEW

The court must determine whether the ALJ's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Ellis v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless, however, if it is coupled with or derived from faulty legal principles." *Graham v. Bowen*, 790 F.2d 1572 (11th Cir. 1986) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). In determining whether substantial evidence exists, the court reviews the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701

(11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983); *Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 590 (11th Cir. 2006) (Table, text in WESTLAW).  Substantial evidence, which is more than a scintilla, but less than a preponderance, is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Ellison*, 355 F.3d at 1275; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted).  If the Commissioner's decision is supported by substantial evidence, and based upon sound legal principles, it must be affirmed, "even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996)).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps.  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairment?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

**5.     Do the individual's impairments prevent any other work?**

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir. 1995); *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986); *Brooks v. Barnhart*, 133 Fed.Appx. 669, 670 (11th Cir. 2005).  The Commissioner can do this through application of the Medical-Vocational Guidelines, also known as the "grids," or expert vocational testimony. *Foote*, 67 F.3d at 1559.   If the Commissioner carries her burden, claimant must prove that he cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *Brooks, supra.*

### PLAINTIFF'S MEDICAL HISTORY

Plaintiff injured his back lifting a heavy object at work on July 7, 1992.  X-rays of the lumbar spine taken three days later were read as normal (tr. 326), and an MRI taken a month later was also read as normal (tr. 325).  From that time until August, 1994, a period of two years, plaintiff was treated by several different general practice physicians.  He complained of chronic, unremitting pain, walked with a limp and used a cane, and also complained of depression (tr. 319).  Plaintiff's pain at that time was in his low back, radiating into his right leg.  Then, from August 1994 until January 1996, the medical record is silent other than for two emergency room visits for a cut thumb and blunt trauma to the right arm (tr. 335-336).

On January 9, 1996, plaintiff first started seeing Paul Pandolfi, M.D., a general practitioner.  Dr. Pandolfi became, and presumably remains, plaintiff's primary treating physician, with his last record prior to the final hearing in this case dated March 11, 2004.  Dr. Pandolfi's records are all brief and hand-written, but generally legible.  At the January 9, 1996 visit plaintiff told Dr. Pandolfi that his previous

physician, Dr. Howard, had told him that he had a mitral valve prolapse but that plaintiff was not happy with Dr. Howard.[1]   Plaintiff also indicated that he was a "nervous person."  His physical examination was entirely normal and Dr. Pandolfi's assessment was questionable palpitation and anxiety.  Plaintiff was prescribed Xanax for anxiety (tr. 393).  Plaintiff returned on September 26, 1996 continuing to complain of stress.  His Xanax was refilled but his physical examination was otherwise normal (tr. 392).

On October 14, 1996, plaintiff returned to Dr. Pandolfi complaining of back pain.  His Xanax was increased but physical examination did not disclose anything relevant to back pain (tr. 391).  On January 28, 1997 plaintiff indicated that he would like medications for back pain secondary to stress at home.   On physical examination, Dr. Pandolfi noted moderate back spasm.  Dr. Pandolfi also noted that plaintiff's workers compensation case was "over" but that plaintiff still had some back symptoms (tr. 390).  From January 1997 until March 2004 plaintiff saw Dr. Pandolfi on a fairly regular basis.  He complained basically of depression/anxiety and low back pain.  As will be discussed in more detail below, although Dr. Pandolfi conducted numerous physical examinations on the plaintiff, he generally found nothing greater than moderate spasm in the back while noting full range of motion in the low back, negative straight leg raising tests, and symmetric deep tendon reflex tests.   In February 1999 an x-ray showed mild to moderate degenerative facet disease, greatest on the right side at L5-S1, but with no acute process (tr. 398).  Throughout plaintiff's course of treatment with Dr. Pandolfi, the diagnosis generally was chronic low back pain and chronic anxiety.

On April 20, 1999, Dr. Pandolfi wrote a letter indicating that he had been treating plaintiff for his low back pain, that plaintiff had not worked since 1991 and that there had been failed physical therapy, medication and injections.  He had daily pain and "in my opinion he is disabled for the foreseeable future."  (Tr. 378)  On

---

[1]  There is no subsequent mention in the medical record of any possible mitral value prolapse.

August 13, 1999, Dr. Pandolfi filled out a form indicating that forward flexion to plaintiff's back was 60°, straight leg raising was negative, rotation was normal and that there was severe spasm present in the low back with radiation symptoms into the right leg.  He further noted that plaintiff stood twisted to the right with 10° forward flexion, that his gait was impaired, slow and waddling, that he could squat, walk on his toes and heels with some difficulty, but that he did not require an assistive device for ambulation (tr. 373).

While he was under Dr. Pandolfi's care, plaintiff also received injections in his sacroiliac and facet joints at L5-S1 by Dr. Krueger, a pain management specialist, but with only temporary relief (tr. 328-333).  Notably, however, Dr. Krueger stated that plaintiff's symptoms seemed to be exaggerated on at least two occasions (tr. 328-332).

In September 1999, plaintiff was in a motor vehicle accident in which he was struck from behind and was treated for a short time by Russell Packard, M.D., a neurologist and headache specialist.  Dr. Packard was concerned with possible neck and head problems and found that there had been a concussion with post-concussion syndrome as well as cervical strain.  He also noted aggravation of low back pain and a pre-existing anxiety disorder.  He felt that the plaintiff would reach maximum medical improvement within "several months," that he was permanently disabled because of his low back pain and should avoid lifting more than twenty pounds (tr. 367-368).

Plaintiff was also seen by a number of consultative examiners.  For his low back, he first saw Peter Szymoniak, M.D., an orthopedic surgeon, on February 7, 2001.  Plaintiff gave Dr. Szymoniak a history of his work-related injury in 1991, aggravated by a motor vehicle accident in 1999, and reported that he had constant lower back pain with pain radiating across his back to his hips as well as pain in his neck and shoulders.  On physical examination, there was full rotation of the neck in both directions with no spasm but mild anterior tenderness.  The spinal contour was

normal.  There was some tenderness at L4-5 and L5-S1 but no muscle spasm.
Plaintiff flexed his back slightly and kept it rather rigid.  He had tight hamstrings, but
straight leg raising was negative and deep tendon reflexes were normal.  There was
no muscle atrophy and plaintiff had full range of motion of his hips although with
complaints of some lower back pain, particularly on the right.  He had a normal gait,
was able to heel and toe walk and did not require any assistive device for
ambulation.  There were no motor reflex or sensory abnormalities in his legs but
there was mild paravertebral muscle spasm with some limitation of flexion and
extension of his back secondary to pain.  Dr. Szymoniak's impression was that
plaintiff had chronic neck and back pain but a normal neurologic examination, and
would not benefit from any surgical intervention (tr. 494-495).  Dr. Szymoniak also
filled out a medical assessment of ability to do work-related activities, and opined
that plaintiff could lift and carry up to 20 pounds frequently, could sit for six hours
and could stand and walk for four hours in an eight hour workday, and that he could
use his hands and feet continuously in work-related activities (tr. 496-499).

After the case was remanded by the Appeals Council, plaintiff was referred to
C.W. Koulisis, M.D., an orthopedic surgeon, on May 30, 2003.  Plaintiff's chief
complaint was right sacroiliac joint pain.  He gave a history of prior injuries.  On
examination, Dr. Koulisis noted that plaintiff's lower extremity complaints "are not
dermatomal in their distribution." (Tr. 502).  On physical examination of the lumbar
spine, there was no spasm, motor strength was 5/5 and equal, reflexes were 2+ and
equal, sensation was intact to light touch, pinprick and vibration, there were
negative tension signs sitting and lying bilaterally, and negative provocative testing
confined to the sacroiliac joints bilaterally.  Range of motion in the low spine and in
all other joints was entirely normal.  Dr. Koulisis concluded that "objectively, he is
absolutely neurologically intact, has a full range of motion of the lumbar spine with
negative tension signs and negative provocative testing confined to the sacroiliac
joints," and required no further diagnostic or treatment modality (tr. 502-504).  Dr.

Koulisis also filled out a medical assessment form in which he opined that plaintiff was not limited in any physical activity (tr. 506-509).

Plaintiff was also seen by mental health practitioners for his anxiety related problems.  He was first seen by Richard Doll, Ph.D., a psychologist, on August 11, 1999.   During the office visit he manifested problems with gait in the form of slowness of movement but no problems with gross coordination.  He was generally cooperative and oriented.  He indicated that he did not understand the concept of social security benefits.  He was cooperative and his mood was pleasant.  His language style was coherent and understandable.  There were no signs of delusions, hallucinations or perceptual distortions.  He reported to Dr. Doll that he had a limited social life with few friends.  His typical day included taking care of his children, listening to the radio and listening to tapes.  He drove a car, did the grocery shopping, prepared meals and did household cleaning chores, the latter on a limited basis.  Dr. Doll's assessment was panic disorder with agoraphobia (by history) and adjustment disorder with depressed mood (by history).  He felt that the plaintiff's prognosis was unclear but that his ability to do work related activities as they relate to capacity for understanding and memory, and sustained concentration and persistence, appeared to be fair to "possibly good."  Social interaction appeared to be somewhat limited (tr. 347-348).

Plaintiff was seen by two other mental health professionals after the Appeals Council remanded.  The first, Kimberly Haga, Ph.D., a psychologist, saw plaintiff on June 11, 2003.  When plaintiff appeared there was nothing unusual about his gait, but he twitched his arms frequently and stated that he had shoulder and back spasms.  He was cooperative but highly "attention seeking" during the evaluation.  He was administered the WAIS-III and the MMPI-2.  He achieved a full scale IQ score of 116 on the WAIS-III.  On the MMRI-2 profile it did not appear that he tried to exaggerate his problems or underestimate them, that he felt his physical health was what it should be and that he felt helpless about his situation.  Dr. Haga felt that

plaintiff was the type of person who rarely took risks, and although he was in emotional and physical pain, he lacked the motivation to participate in treatment. "He might not intentionally feign his problems, but often persons with his profile derive secondary gain from their physical problems which only perpetuates their problems. As such, they are poor candidates for treatment." (tr. 510-512). Dr. Haga also filled out a form assessing plaintiff's ability to do work related activities as it was affected by his mental status, and felt that his ability to respond to supervision, coworkers, and work pressures were markedly impaired with respect to interaction with the public, supervisors and coworkers, extremely impaired with respect to responding to work pressures and slightly impaired in responding appropriately to changes in a routine work setting (tr. 513-514).

The final expert to examine plaintiff was Peter Szmurlo, M.D., a psychiatrist, who saw him on March 22, 2004. Dr. Szmurlo reviewed the records of Dr. Doll and Dr. Haga. Based on plaintiff's history and Dr. Szmurlo's consultative examination, Dr. Szmurlo felt that plaintiff had mild depression and occasional episodes of panic. His psychomotor activity was normal, movements of his body were normal and he did not exhibit any excessive pain behaviors. He had no delusions, hallucinations, or feelings of worthlessness, but did feel helpless. Dr. Szmurlo's diagnostic impression was panic disorder with limited agoraphobia avoidance and chronic low back pain. He felt that plaintiff's psychiatric condition should not preclude his ability to return to gainful employment (tr. 515-517). Dr. Szmurlo also filled out a questionnaire on plaintiff's ability to do work related activities from a mental standpoint, and found that he was slightly impaired in responding appropriately to work pressures in a usual work setting and in responding appropriately to changes in a routine work setting, but that plaintiff was otherwise not impaired mentally (tr. 518-519).

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Plaintiff testified at two hearings after the remand.  At the November 14, 2003 hearing he told the ALJ that he was 45 years old; that he had a drivers license and drove; that he had a high school education; that he had last worked in 1991 or 1992 as a carpenter and maintenance man; that he was injured on the job and settled with the compensation carrier; that his wife worked and he stayed home; that he was aware of Florida's Vocational Rehabilitation program, but had never pursued it because he didn't get away from the house very often; that his wife kept the family books and paid the bills, and gave him $300 every two weeks for groceries; that he had been to counseling because his wife was "seeing somebody else;" that he had twice been hit in the rear while stopped in his car; that he had quit drinking and smoking dope two or three years earlier; that he went to the doctor monthly but x-rays never showed much of anything; that the doctor just refilled his medications; that he cleaned the house, did the laundry, and occasionally cut the grass; and that he played the guitar at church (tr. 94-124)

At the July 30, 2004 hearing plaintiff testified that he had been a carpenter for most of his adult life; that he had not worked since being injured in 1992; that his pain was unbearable; that not working depressed him and lowered his self-esteem; that he stayed home during the day, took care of his children, and did a little housework; that he was active in his church and was a fourth degree knight in the Knights of Columbus (KOC); that he attended the monthly meetings of the KOC during the winter, but not during the summer; that he played the guitar at church on Wednesday nights; that he drove a car; that he was not getting psychiatric counseling; and that he had not received any counseling concerning his family problems for nearly ten years (tr. 133-153).

## DISCUSSION

The plaintiff argues that the ALJ erred (1) in failing to give appropriate credit to the opinion of the treating physician, (2) in disobeying an order of the Appeals

Council, (3) in not giving appropriate weight to the opinion of an examining psychologist, (4) in improperly discrediting the plaintiff's subjective complaints of pain, and (5) in acting with bias against the plaintiff, and that plaintiff was disabled from his onset date as a matter of law.  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of his and physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

There is a great deal of overlap in the plaintiff's contentions, and in the ALJ's analysis of the facts, so for ease of reference the undersigned has compressed the issues into three:  (1) the ALJ allegedly disobeying the remand order of the Appeals Council, (2) the ALJ's alleged bias, and his discounting of the opinion of the treating physician and plaintiff's subjective complaints of pain, and (3) the ALJ's discounting of the opinion of the examining psychologist.  The case has had a somewhat complicated and lengthy history, but will be resolved in this court in keeping with the plainly stated analytical framework set out above.

1.    Appeals Council order.

Plaintiff contends that the ALJ disobeyed the remand order of the Appeals Council to allow counsel to submit written interrogatories to Dr. Szymoniak, and to seek additional information or clarification from Dr. Pandolfi (doc. 13, p. 4).  The plaintiff's arguments fail on both counts.   With respect to the interrogatories, it is true that the Appeals Council ordered the ALJ to "[p]rovide the claimant and his representative the opportunity to request the completion of interrogatories" from Dr. Szymoniak.  The record also clearly shows that counsel waived that opportunity.  At the July 30, 2004 hearing before the ALJ, the following occurred:

ALJ:   . . . .  "[T]he Appeals Council says that there was a CE by Dr. Szymoniak was (sic) entered into the record as a exhibit and you weren't given an opportunity to submit interrogatories to Dr. Szymoniak . . .and what did

we ever do with Dr. Szymoniak's interrogatories?  Did we ever get them done?

ATTY:  I don't think they were ever sent, Your Honor.  They were sent to [the previous ALJ] Judge Graham's office to ask him to send them to me but there is an assessment from Pandolfi that I think takes care of it so I would waive - -

ALJ:  Oh, there's another assessment, too, after that.

ATTY:  Yeah, I'd waive that.

(Tr. 130).  Counsel did not thereafter ask to withdraw his waiver, nor was there any further discussion concerning interrogatories.  Contrary to plaintiff's argument here, the Appeals Council did not order that any interrogatories be sent, only that plaintiff be afforded that opportunity.  Where plaintiff contends that "[w]e never got that opportunity" (doc. 13, p. 18), he is mistaken.  The opportunity was there, and was waived, as the transcript clearly shows.  Plaintiff's further argument that Dr. Szymoniak's opinion should not have been considered at all, because he did not have the opportunity to propound interrogatories, therefore fails.  Plaintiff waived his opportunity to cross-examine by interrogatories, and Dr. Szymoniak's opinion was properly in the record and was properly given consideration.

Contrary to plaintiff's second argument, the Appeals Council did not order the ALJ to seek additional information or clarification from Dr. Pandolfi.  Rather, it ordered him to "[g]ive further consideration to [Dr. Pandolfi's] opinion . . . ."  It further ordered that "[a]s appropriate, the Administrative Law Judge *may* request [Dr. Pandolfi] to provide additional evidence and/or further clarification . . . ."  (Tr. 208) (emphasis added).  There is no question that the ALJ gave Dr. Pandolfi's opinion further consideration, and this court cannot say that he abused the clear *discretion* that the Appeals Counsel allowed him concerning follow-up, particularly where voluminous records from Dr. Pandolfi were made part of the record during the remand (tr. 520-569).

A further problem with plaintiff's argument on the Appeals Council order lies in the Appeals Council's refusal to review the case after the instant ALJ decision was issued.  That is, plaintiff told that Appeals Council that the ALJ had disobeyed its earlier order, but the Appeals Council obviously disagreed because it refused to review the case.  Specifically, it "found no reason for review of the Administrative Law Judge's decision dated March 24, 2005."  (Tr. 10).  This cannot be read as anything other than a finding that Appeals Council was satisfied that its earlier order was followed.  Therefore, the plaintiff's contention that the ALJ disobeyed the remand order of the Appeal's Counsel is without merit.

2.     Bias, the opinion of the treating physician, and plaintiff's subjective complaints of pain.

Plaintiff contends that the ALJ's unfavorable decision was a foregone conclusion, based largely on comments by the ALJ at the beginning of the November 14, 2003 hearing.  Plaintiff characterizes the ALJ's comments as a "diatribe," and says this proves plaintiff's case "would never receive a fair review." (Doc. 13, p. 7).  The court thinks plaintiff's characterization is too strong.  At the beginning of the hearing the ALJ, having already reviewed the record, indicated that although plaintiff claimed a terrible back condition, he (the ALJ) did not see the underlying condition (tr. 87).  He noted that the x-rays were normal except for some narrowing of the L5-S1 facet joint, that the existence of an underlying impairment is not sufficiently proven just by treatment records, and that there had to be some objective evidence of a condition to support the severity of the back problem plaintiff was claiming (tr. 88-90).

While this may appear to be an indication that the ALJ was not impressed with the medical record he had seen, there was a good reason for the ALJ to be so inclined.  As the ALJ knew, and as this court is well aware, pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain

alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In *Hand v. Heckler*, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the *Hand* test.  *Wilson v. Barnhart*, 284 F.3d 1219 (11th Cir. 2002); *Kelley v. Apfel,* 173 F.3d 814 (11th Cir. 1999); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Martin v. Railroad Retirement Bd.,* 935 F.2d 230, 233 (11th Cir. 1991).

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  *Elam*, 921 F.2d at 1216. The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (citing *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  *MacGregor v. Bowen*, 786 F.2d at 1054; *Holt v. Sullivan*, 921 F.2d at 1223.  "Although this circuit does not require an  explicit finding as to credibility, ... the implication must be obvious to the reviewing court.   The credibility determination does not need to cite particular phrases or formulations but it cannot

merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).   The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991).

Thus, while the ALJ opened the hearing by expressing misgivings about the strength of the plaintiff's case, the nature of his remarks show he was doing so in the context of the clear standard the law required him to apply, not as an expression of bias.  And ultimately, the fundamental reason the ALJ found plaintiff not disabled was that he found that plaintiff simply was not credible;  the minimal findings on x-ray, without much more, coupled with the plaintiff's active social life, indicated that he was not hurting as much as he claimed.  As will be discussed below, there was substantial record evidence to support this finding.

Plaintiff also argues that the ALJ did not properly discount Dr. Pandolfi's opinion.  Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; see also *Lewis*, 125 F.3d at 1440 (citing cases).  Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. 20 C.F.R. § 404.1527; *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Spencer on Behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005).  "When electing

to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241.   Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[2] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).   The opinion of a nonexamining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician.  *See Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); 20 CFR § 404.1527(d)(2).   However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

Plaintiff's credibility also played a large part in the ALJ's consideration of Dr. Pandolfi's opinion.  As is obvious from the earlier recitation of plaintiff's medical record, his claimed disability relates almost entirely to pain.   Underlying the *Hand* standard on pain, outlined above, is the need for a credibility determination concerning a plaintiff's complaints of pain.   Those complaints are, after all, subjective.   "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[3]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.   "Reasonable minds may differ as to whether objective medical

---

[2] *MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  786 F.2d at 1053.

[3]  Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  *Hand, supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Thus, a very critical part of the ALJ's analysis centered on the plaintiff's credibility.  Dr. Pandolfi, who treated plaintiff over a period of more than eight years, opined that plaintiff was "disabled" (tr. 378), and that his pain was such as to make him unable to work (tr. 490-92).  He further opined that plaintiff could only occasionally lift or carry as much as 10 lbs., could use his hands *and* feet for repetitive movements such as fulling or pushing controls, and that he could never squat, and could only occasionally bend, crawl, climb, or reach (tr. 493).  Plaintiff says that the ALJ erred with regard to Dr. Pandolfi's opinion in two respects: (1) he disobeyed an order of the Appeals Council to allow plaintiff's counsel to cross-examine (with written interrogatories) a post-hearing examining physician, Dr. Szymoniak, upon whose opinion  the ALJ relied in discounting Dr. Pandolfi's opinion, and (2) he did not give appropriate weight to Dr. Pandolfi's opinion and did not discount that opinion properly.  The matter of the interrogatories was discussed earlier, and is meritless.  The court must therefore look at the ALJ's decision and determine whether he gave appropriate weight to Dr. Pandolfi's opinion.

The ALJ specifically "rejected the multiple opinions offered by Dr. Paul Pandolfi regarding the prevalence of the claimant's physical symptoms and their purported disabling effect on him." (Tr. 27).  His conclusion was "driven by a variety

of factors supporting one central theme: the claimant lacks credibility when it comes to assessing the validity of his testimony and overall subjective account of disability presented. . . ." (*Id.*).   The ALJ gave four specific reasons for finding that plaintiff lacked credibility concerning the nature and extent of his claimed disability: (1) there was a "vast disparity" between plaintiff's complaints and the objectively demonstrable medical evidence, (2) physical and mental examinations have not supported the degree of loss of functional capacity claimed by plaintiff, (3) the plaintiff has received very little mental health treatment, and (4) plaintiff has presented "grossly exaggerated symptomatic accounts wholly out of proportion to all medical findings" and inconsistent with his own description of his daily activities (tr. 27).   There is substantial record evidence to support the ALJ's findings.

As was shown in the earlier summary of plaintiff's medical history, there has been a very lengthy course of conservative medical treatment for a condition that has minimal objective evidence to support it.   Immediately after his work-related injury, an x-ray and an MRI of the lumbar spine were both read as normal (tr. 326). Two years later plaintiff complained to Dr. Howard of chronic, unremitting pain (tr. 319), but at that point, even though plaintiff limped and walked with a cane, his reflexes were normal, straight leg raising was negative (tr. 318), and there were absolutely no positive signs to support an underlying problem.   More than four years later, during which time plaintiff did not work, an x-ray was read as showing "no significant degenerative disc disease" but with "mild to moderate degenerative facet disease, greatest on the right side L5-S1," with no acute process (tr. 398).   That x-ray report is the single radiographic or other totally objective medical finding in the record that shows any problem with plaintiff's low back, yet plaintiff has consistently complained of severe pain of such intensity that he could not work.   At the February, 2001 hearing plaintiff told the ALJ that pain was his constant companion (tr. 55), that he never had a day without pain, and that it varied from "so overwhelming that everything goes dark for a minute" to some days when he is not aware of it (tr. 58).

He testified that he had a computer, but using it made his arm go numb and that he had to lie down every day because of the pain (tr. 60).  In a 1999 report he said that he had such pain in his hands that he could not hold a cup of coffee and that it felt like his legs and feet, especially on the right side, were on fire (tr. 298).

The medical record is also replete with inconsistencies.  On January 18, 1999 Dr. Pandolfi found severe spasm in plaintiff's low back a few weeks after he had hurt his back lifting something (tr. 382), and in every other instance when he recorded spasm it was moderate (tr. 390, 385, 281).  At the same time, Dr. Pandolfi almost always recorded full range of motion in plaintiff's low back, negative straight leg raising tests, and full and symmetrical deep tendon reflexes (tr. 378-380, 385, 393, 524, 535, 539-541, 548).  Plaintiff continued to use a cane, but even Dr. Pandolfi indicated that he did not need one (tr. 373).

Dr. Krueger, a pain management specialist, noted more than once that he thought plaintiff was exaggerating his symptoms (tr. 328, 331-33).  Finally, the independent consultation by Dr. Szymoniak, an orthopedic surgeon, disclosed a person whose examinations were absolutely normal, prompting Dr. Szymoniak to remark that x-rays of the low back were normal and that plaintiff had a normal neurological examination, and further opine that plaintiff could lift and carry up to 20 lbs. frequently, and sit for six hours and stand and walk for four hours during a normal workday (tr. 494-498).  The consultative examination by Dr. Koulisis, an orthopedic surgeon disclosed that plaintiff's lower extremity complaints were not dermatomal,[4] his physical examination was absolutely normal, including normal motor strength, reflexes, sensation, and he was "absolutely neurologically intact . . . [with] full range of motion of the lumbar spine with negative tension signs and negative provocative testing confined to the sacroiliac joints."  (Tr. 502-504).  In Dr. Koulisis' opinion, plaintiff had no physical restrictions whatever (tr. 505-09).

---

[4] The areas complained of did not follow normal nerve patterns.

Finally, Dr. Pandolfi is not a specialist.  The Commissioner's regulations provide that she gives "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(d)(5).  Plaintiff complained bitterly about his pain, and testified at the November 2004 hearing that all he wanted was to live a normal life.  Dr. Pandolfi believed that plaintiff was in pain, but Drs. Krueger and Koulisis obviously did not, nor did the ALJ.  It is not for this court to say who is correct.  It is for this court only to determine whether the ALJ's decision was supported by substantial record evidence.  It was, as the foregoing discussion shows.  Consequently, the undersigned finds that the ALJ was not biased, and that his opinion and resulting decision concerning the opinion of Dr. Pandolfi and the plaintiff's subjective complaints of pain, were supported by substantial record evidence, and should be affirmed.

      3.    **Examining psychologist's opinion.**

Plaintiff contends that the ALJ erred in discounting the opinion of Dr. Haga, who examined plaintiff in June, 2003.  The ALJ gave six reasons for discounting her opinion.  First, he found that her conclusion was inconsistent with that of a better-qualified board certified psychiatrist, Dr. Szmurlo (tr. 30).  Plaintiff argues that there is no support for the idea that a psychiatrist is better qualified than a psychologist, because they are both accepted as treating sources by the Commissioner's regulations.  As between the two disciplines plaintiff may be correct, but there is undoubtedly a difference between a professional who is board certified, like Dr. Szmurlo, and one who is not.  Second, the ALJ emphasized Dr. Haga's finding that plaintiff's test scores produced a profile consistent with a person seeking secondary gain (tr. 30-31).  Third, the ALJ noted that plaintiff did not disclose his alcohol and marijuana use, something the ALJ found would have a detrimental effect on plaintiff's mental health (tr. 31).  Fourth, the ALJ noted that plaintiff did not disclose to Dr. Haga the wide range of his daily activities (*id.*).  Fifth, the ALJ noted that

plaintiff had received counseling in 1992 and had benefitted from it, but thereafter had no counseling, and took only medications prescribed by his primary care provider (*id.*).  Sixth, the ALJ found that the opinions of Dr. Doll and Dr. Szmurlo were convincing.  The regulations require the ALJ to consider all the evidence, and he is not required to choose the opinion of one examining mental health provider over another.  All the ALJ's reasons for discounting Dr. Haga's opinion were supported by substantial record evidence and logical reasoning, and plaintiff cannot show error in the ALJ's rejecting it.

In conclusion, plaintiff has failed to show that Judge Ryan disobeyed the Appeals Council's remand order or was biased, that he improperly discounted the opinion of Dr. Pandolfi, that he improperly discounted plaintiff's subjective complaints of pain, or that he improperly discounted Dr. Haga's opinion. Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

At Pensacola, Florida this 15th day of November, 2006.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**